Good morning, Your Honors. I'm Lisa Darling Alderton. I represent Starr Insurance Company in this case. And I would like to reserve five minutes at the end for reply. All right. Watch your clock. The California Insurance Code recognizes that for the insurance market to work, insurers have to be able to rely on the representations of the insured when deciding whether or not to accept a risk. Obviously, the more time and money an insurer has to spend during the underwriting process, the slower the process of policy issuance will be and the higher the premiums. The California Insurance Code places an affirmative obligation on both parties to a contract to communicate all material facts. This disclosure obligation applies in many circumstances, even if a specific question was not directly asked. However, Article I, Section 333 and 336 list some circumstances where a question must be asked, an inquiry made, before an insured is obligated to disclose certain types of information. If material facts are concealed, Article I, Section 331 provides that a policy can be rescinded. Once a representation is made, however, whether voluntarily or in response to an inquiry, the insurance code provides the parties the right to rely on those representations. And if a representation is false in a material point, Article II provides a second, separate statutory authority to rescind a policy. Well, okay, you argue the rule of waiver applies only to actions for concealment, not misrepresentation. But your First Amendment complaint alleged actions under California Insurance Code provisions governing concealment. So why doesn't the law of waiver, why does the law of waiver not apply? Well, first of all, I'm not arguing that the law of waiver doesn't apply at all. The common law waiver standard, the intentional relinquishment of a known right, I believe that would apply. What I argue does not apply is Section 336 of Article I of the Insurance Code. Now, yes, you're right, our complaint alleged alternative theories of possible rescission. We argued both concealment and misrepresentation. But what was established and proved on summary judgment was an actual material misrepresentation in writing, in applications and in e-mails. Section 331, in context of Article I, is talking about when an insurer must ask a question in order to proceed with a concealment argument against an insured. When there was silence, when there should have been speech. They say there are times, the code says there are times when there should have been a question asked. Article II does not refer to that section in any way. Article II does refer back to the Article I's definition of materiality. But it does not refer back to this waiver on inquiry made. Regardless, in this case, it is absolutely clear that STAAR inquired about the amount of paper and plastics that SunWest metals. It does appear, but STAAR's post-claim inspection report showed that 65 percent of SunWest's revenue came from recycling paper products. Doesn't that report reflect that STAAR had investigated SunWest's operations earlier? It would have, if it had done that, it would have discovered the truth that a significant part of its business was paper processing? No. The 65 percent paper and plastics was not discovered by STAAR until after the fire loss. After STAAR had hired a forensic accountant to go through all of SunWest metals daily receipts at a cost of $35,000 to STAAR to discover that was the annual revenue percentage, that was the true percentage. The inspection that happened during the course of the policy was a brief general liability inspection. The inspector ---- Well, you were obviously, you talked about the paper and all of that, and then you asked for some answers, and then you didn't, when you got vague answers back, you didn't do anything, and then the fire happens two years later, right? That was ---- I disagree with that characterization. The inspection said that the description of the stock on site was aluminum, glass, and paper. Now, the only one of those that is a concern under our guidelines is paper. The inspection report, and you'll find this at the excerpts of Record 529, also said that the maximum and minimum value of the stock on site that day was only between $10,000 and $20,000. We're talking about a $5 million, $5 to $6 million per year operation, according to the application that STAAR had received. So the fact that maybe a third or less of $10,000 to $20,000 on site this one particular day involved paper did not notify STAAR that paper was actually 65 percent of their business operation. Now, we talked a little bit about the waiver standard here. The waiver standard under common law is the intentional relinquishment of a known right. The California Supreme Court has explained that waiver always rests on intent. This is the waiver standard that applies in any context, including rescission of an insurance policy, but our district court here did not apply this law, did not determine that there was an intentional relinquishment of a known right. According to established waiver law, the district court needed to find that STAAR actually knew it had the right to rescind at some earlier point in time. The district court did not make that finding. Based on the findings of fact, it could not have made such a finding. Instead, the district court held that all that SunWest had to prove was that STAAR was in possession of information that distinctly implied that SunWest paper and plastic processing exceeded the amounts represented. Isn't that what the statute says? It uses the term distinctly implied? That is what Section 336 says about when an insurer has to make an inquiry. And the district court failed to even analyze that very important part of the statute. The statute says an insurer may waive a right to obtain information from the insurer. It doesn't say anything about the right to rescind, but the right to obtain information by neglect to make inquiries. The judge did not state that part of the rule. The judge did not apply that part of the rule and did not analyze whether or not the inquiries made would satisfy and avoid the waiver under that statute. Regardless, in all cases in the last 30 years that have discussed waiver in the context of the rescission of an insurance policy, all courts have said that the common law waiver standard of the intentional relinquishment of a known right applies, even when Section 336. It seems to me that if you had just gone on their website, you would have known that a big part of their business was cardboard and paper, your client rather. Well, my client did go to the website and did review that. And remember, a website is an advertisement. A website is not a financial report that says, you know, our percentage of revenue is this much. Wouldn't it make you a little suspicious? I mean, the problem here is that insurance companies, the reason this law exists is that insurance companies can sort of have deliberate or blind indifference to what's actually going on, take the premiums from an insured, wait until there's a loss, and then all of a sudden go, aha, we have grounds for rescinding, and that's what the law protects against. That's not what happened here. Our underwriter did review that website. And in response to reviewing that website, sent an e-mail that you can find at the excerpts of Record 418 that said, on the questionnaire, you indicated recycling of plastics and papers is a very small amount of the operation. However, on the website, it advertises as a place to bring bottle deposit returnables. We need the complete details on plastic and paper recycling. And that went to Dunlop, right? Yes. Of course it went to Dunlop because that is SunWest Metals' agent. That is, they were representing, Dunlop was representing SunWest Metals in this transaction. And all of the testimony at trial was that all communications would go through that agent, and there was nothing improper about that. So the question was asked. A response was received. Then we got in the inspection report, which you mentioned before. And after the inspection report, a second e-mail was sent specifically asking, noting that there was a discrepancy. Saying, in review of the physical inspection, it indicates the operations consist of purchasing aluminum, glass, and paper. But your supplemental said it was aluminum and iron. Please confirm. And in response, we got a deliberate deception. In response, Starr was told, each day the amount varies. The day the inspector came in, it may have had slightly different numbers. The application is the average of the entire policy year. Now, there was no reason, based on the information that Starr had, to know that that was false. The numbers that were provided, this 4 million in sales of aluminum and 1 million in sales of iron and steel, that comported with the information provided in the original application. Furthermore, in order to know that it had the right to rescind, Starr had to not just suspect that the information provided on the application was not correct. It also had to know that the true information would have been material to its underwriting decision. So are you arguing, what, so this report found eight grounds on which the evidence should have distinctly implied that the it had a right to, it should have investigated further. Are you saying that all of those are clearly erroneous findings of fact? No, I'm not saying that. I am saying, I have no problem with his argument that some of these things raise suspicion. What I have a problem with is the application of the law to these facts under this case. Because while suspicions may have been raised, the evidence was that Starr noticed that, followed up on that, inquired further, asked the only party who had the answer, the only party who they could ask about SunWest Metals annual revenue. This is not a case where Starr could have gone to a third party like a doctor and gotten medical records. And what precluded Starr from talking directly to its insured? The fact that they were represented by an agent in this case. The agent is represented. Is there a law that precludes you from doing further site inspection or asking for evidence of the financial records, supporting its representation, or, you know, making some independent further investigation yourself? I mean, you certainly did that after the loss. Correct, correct, at a significant expense that was more expensive than the cost of the premium. And that's something else that has to be considered here. You know, the California Insurance Code says that you can rely on the representations of the insured, and it does that for a reason, because you can't spend more money than the premium collected trying to figure out if they're lying to you. We followed up. We asked them questions. We got a response. The broker was an agent of SunWest Metals. Starr had no reason to believe that the broker was completely making things up without talking to SunWest. Except for there's stuff that's going on in 2011, 2012, and then you actually go through a renewal application, too, don't you? Yes, there is a renewal application. And you've got in 2012, Le Moyne received a report detailing an inspection of SunWest in 2008 prepared by the California Workers' Comp Independent Review Board. The report stated that SunWest's operations consisted of buying and selling non-ferrous scrap metal approximately 60 percent, ferrous metal 2 percent, newspaper, computer paper, cardboard 35 percent, and CRV bottles, glass 3 percent, and that was all before the renewal. And then also, I think in January of 2012, there was a second site inspection was commissioned pursuant to SunWest's application for workers' comp policy. On that day of the site visit, SunWest received hundreds of thousands of pounds of cardboard and more than 21,000 pounds of CRV plastic. Apparently neither G.J. Sullivan nor Meadowbrook reviewed this report. I mean, there's a lot of things that are going on, and then you actually go through a renewal. There's no doubt that SunWest misrepresented things, but that being said, there were a lot of things, as Judge Wardlaw said, that the district court found, and as things that put them on notice to do more investigation or to follow through. And, Your Honor, those things came in during the first policy period. And that WCIRB report that you mentioned was almost four years old at the time that it came in. And after that report came in, there was a requirement of a signed supplemental application on renewal. And, in fact, STAR went as far as to send a notice of cancellation when that signed supplemental application was not received. You've used almost all your time. If you want to save any time for rebuttal, you might want to hold the arrows in your quiver there. Good morning, Your Honors. My name is Duke Walquist, and my clients are in the courtroom here today as well. I would like to reserve five minutes of my time, if I might, for the... You don't have any time. You don't get to do a rebuttal. You don't have a cross-appeal, do you? I do have a cross-appeal. You do have a cross-appeal. Oh, on the offset. Yes, and also the standard... Why don't you just address it? Okay. That's fine. I'll do it any way you tell me to. Let's start with the standard then, because I think it's important that the Court understand the procedural posture in which this went to trial, and that is that Judge Carter determined on summary judgment that STAR had already proved a prima facie case of rescission, which he determined to be a misrepresentation regarding a material fact or a concealment of a material fact that could have been totally innocent. He thought that would have been sufficient. So we went to trial on what was essentially three affirmative defenses. Excuse me. I can't hear you. Can you please tell them to be quiet in the hall? This is law students from Irvine, I'm certain. We went to trial on three affirmative defenses. One was a statutory waiver under Insurance Code 336, which has been quoted earlier today, and all can plainly see it. The other was a latches affirmative defense, and the third was an estoppel affirmative defense. And Judge McCormick, the trial judge, never reached the second two defenses. He proceeded only in connection with the first affirmative defense. Our first position, of course, as cross-appellant, is that we were put to prove a standard that we didn't need to meet, that under both the written provisions of STAR's policy, and under the mandatory provisions of Insurance Code 2070 and 2071, to rescind once there's been a loss in connection with a fire case like this, you have to prove actual fraud, that is, an intention to deceive on the part of the insured. And there are good reasons for that rule, because if you look at property policies, there are oftentimes what I'll call innocent co-insureds who can be involved. Your client doesn't really fall in that category, to be perfectly honest. But that being said, I mean, it appears that the court thought that your client did make some misrepresentations, but it was that they were, but that STAR put a blind eye to it, didn't follow it through, and then waited until there was a catastrophic disaster, and then said, oh, we want to rescind now.  There's explicit findings by Judge McCormick that my client neither knew nor approved of the representations that were made with respect to their business. So your position, and you think the court found this, was that DENLAP made all the representations and your client didn't know? Without the knowledge or authorization of my client. And not only did he find that, there's not one shred of evidence in the record to suggest my client did know. But where did DENLAP get all the financial information? They made it up. Well, I know there's a settlement with DENLAP, right? There is a settlement with DENLAP. And you're complaining about that it was set off. I am complaining. I can jump ahead to that topic. Well, that's probably the point that from its, okay, SunWest recovered from STAR on its breach of contract claim, right? That's the one that you won on. And the district court offset that award based on SunWest's settlement with DENLAP. Correct. Now, I guess, and didn't offset all of it, just the part that they believed was as to the damages of the, because DENLAP didn't, DENLAP's settlement covered attorney's fees and maybe $500,000 plus some change and then $200,000 something was offset. $500,000. I think that's under seal, but it's $535,000. But this offset wasn't the attorney's fees. It was for the physical plant. It was. And so I know that you cite certain cases that seem to, I think, sound in tort, but what authority do you cite for the proposition that the collateral source rule applies to contract damages? Because it seems to me looking at this, your client was made whole and it would be a double recovery. Well, I don't think my client was made whole under any circumstances. Okay. Got all the money between DENLAP and STAR. Got the money for the premises fire, right? Right. Well, I don't think that the, that would be, if you accept that the offset should have been given in the collateral source rule, which should not apply, that's true. But there is no statutory authorization whatsoever for application of an offset in this circumstance. There are, there's a statutory authorization for an offset when you have a joint tort feature, which we don't have here. But this is in contract, right? And there's also statutory authorization for a offset when you are joint obligors on a contract. But there is, we cited one decision to you, I think two decisions. One was the Shell Oil case on this particular topic. And the other was the SEC case, which is a district court case. It's Judge Carter. And what you had there was a settlement with a bank that was sued on a breach of contract action. And later on the bank or the lawyers who had been sued for negligence in connection with the transactions asked for an offset in connection with the settlement. Okay. But there's a California Court of Appeal case, Plut versus, Plut or Plut or something like that versus Fireman's Fund, that in that, which was a breach of contract, I think also, and that I think Plut is best read as endorsing a broader equitable doctrine of preventing double recovery for contract damages. Well, there are certainly cases that talk about not allowing double recovery where you have a single plaintiff, for example, suing a single plaintiff. Or you have a single defendant and proceeding on more than one theory, say fraud and contract. I'm not aware of any case that decided under California jurisprudence that ever allowed an offset against one plaintiff by a defendant that wasn't done under either the statutory provisions for contribution from a joint tort fees or for contribution from a co-obligor on a contract. I don't think there is any such case. So I'm curious, what would be your theory why this isn't a double recovery if the offset were not allowed? Well, I will tell you, at the end of the day, my client spent more than the $535,000 they got from Dunlop's just litigating this case. But that was part, but that's why. And you can tell me that is the American rule, I suppose, and that's tough. But I think the reaction to that, in part, is the collateral sort of thing. But this rule is also the American rule. I'm sorry, didn't you also recover attorney's fees in this case? Wasn't that part of the... No, there's no recovery for attorney's fees. There's no recovery against the defendant and appellant for attorney's fees at all. Judge McCormick rejected our contention that Starr had acted in bad faith and that we would have had to approve bad faith to recover. He did not give us any attorney's fees. But your settlement with Dunlop contemplated $535,000 in attorney's fees? It did. Well, it contemplated that part of that settlement was allocated to attorney's fees, which, of course, was disputed. It was contested. It was a compromise, and the attorney's fees continued to mount as we sit here today. And I believe at the time the record was settled in this case, they approached $900,000. Yes, I saw a figure like that, $858,000. Okay. It's close to mine now. And I want to come back, I suppose, to the... issue, I believe, which is pretty clear under both the contract, at least under the contract. I believe under the case law as well, and the statutes as well. But the whole waiver issue, even under the standard that we were held to... In closing in this case, some people have quoted Bob Dylan. I quoted the Rolling Stones. There's a Stones tune called Sweet Lies. Essentially Mick Jagger and... Little Lies? Keith Richards, pardon me? Sweet Little Lies, is that what you're referring to? You know the tune. Yes, I do. Okay. You don't have to mean it. Just say those words to me. And what you had happen here was you had Mr. King, who was the lead underwriter for an insurance company, who when he reviewed what came from his Lemoyne after her review of the website said, here's what you're going to do. You're going to go confirm that only minimal amounts of paper, and you're going to do it by our own loss inspection. And Star sent their own loss inspector out there. He went out there twice for two different inspections. The first day he was there, 500,000 pounds of cardboard got processed on that site. I urge you to look at the supplemental excerpts of record in this case, which depict in graphic terms what this site looks like. An old trial judge once told me, Duke, your case, whatever you do, has got to preserve the appearances, which means you've got to acknowledge what any fool can see. And if you go look at those pictures and look at that website, you can't walk on that premises without tripping over cardboard or paper. They sent an inspector out to see it twice. He's their agent. So what standard, you're saying, what is the standard that you're contesting that you think was implied, that it had to be an intentional mistake? I don't think Star, yes, I don't think Star even proved a prima facie case of rescission because they didn't prove actual fraud and intent to deceive by my client. So if we were to rule in your favor, not with regard to the offset, what difference does that make? If you're going to affirm his finding under the other standard, not one whit. Okay. So why don't you address the offset, if you have anything further to say on that. I think I've addressed everything I have to say, Your Honor. I've briefed it extensively, and I appreciate the Court's time and indulgence. I'd like to focus just a little bit on the issue of materiality. Now, to know that Star had a right to rescind, it had to know not just that the information was false, but that the true information would have caused their underwriters to make a different decision here. Courts have explained that an incorrect answer on an insurance application is not grounds for rescission, where the true facts, if known, would not have made the contract less desirable to the insurer. Now, we've heard a lot about the amount of pounds of cardboard that would have been on site on one particular day or even many days. But materiality is a subjective test under the law. A reasonable insurer standard does not apply. It does not matter what SunWest Med's opinion is or what the District Court's opinion is about what metric Star should have used in determining whether or not to accept this risk. They might say you should have used volume or pounds rather than annual revenue. But the way Star's scrap dealers program was set up, the way the supplemental questionnaire, the questions were asked, was percentage of annual revenue. Right, but it doesn't seem that SunWest Medals even understood what your program was. Well, that is at some level beside the point, because Star asked the question they needed for their application in order to figure out whether they fell within their guidelines and they followed the information that was provided in making their decision, for one. For two, Mr. Dunlap did know. Mr. Dunlap had tried to get a different insurer in called Bethel Plastics and was told this is a scrap metal program. So there was some knowledge there of SunWest's agent that this was meant to be a scrap metal program. Now, the percentage of annual revenue is what was asked. A one-day inspection of how much cardboard is on site that day is not going to tell you the percentage of annual revenue. Cardboard is worth like one-fourteenth as much as aluminum. There could be quite a bit there, and it might have been worth less than the aluminum that was on site. There is nothing in any of the case law about rescission and waiver that says an insurer has to go through and hire a forensic accountant. But it certainly puts you on notice of something. It would be like, you know, at a workers' comp thing that they have a video of the guy up on the roof. Well, that doesn't tell you what he could do every single day, but the fact that he could climb up on the roof one day or, you know, when you go out there and there's cardboard all over the place, that would be very concerning. Which is why, after they got the inspection report, they asked. They asked, this looks different than what was told to us in the application. Is this right? What are your actual operations? And they were given a deliberate misdirection. Every day the amount varies. What we're giving you is the annual revenue. What we told you was correct.
judges: Wardlaw, Callahan, Quist